UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BELLRIDGE CAPITAL, LP,<br><br>                          Plaintiff,<br><br>v.<br><br>EVMO, INC., f/k/a YayYo, Inc. and<br>Rideshare Rental, Inc.,<br><br>                          Defendant. | Civil Action No.: 1:21-cv-7091<br><br>**COMPLAINT** |

Plaintiff Bellridge Capital, LP ("Bellridge Capital"), by and through its undersigned counsel, as and for its Complaint against defendant EVmo, Inc. ("EVmo"), formerly known as YayYo, Inc. ("YayYo") and Rideshare Rental, Inc. ("Rideshare Rental" and, together with EVmo and YayYo, the "Company"), hereby alleges as follows:

I.    **NATURE OF THE ACTION**

1.    This action arises out of defendant's wrongful refusal to honor Bellridge Capital's exercise of a warrant to purchase up to 1.5 million shares of its common stock as part of the consideration offered to induce Bellridge Capital to invest $6 million in the Company's struggling business operation.

2.    Bellridge Capital made this investment at a time when the Company faced extraordinary obstacles to raising capital due to its untested business model and the reputational cloud surrounding its founder, Ramy El-Batrawi.  Among other things, El Batrawi previously had been sued for securities fraud by the United States Securities and Exchange Commission ("SEC") and then barred for five years from serving as an officer or director of any publicly traded company.

3.      Despite these considerable risks, Bellridge Capital in 2018 agreed to invest the $6 million that was essential to the viability of the Company's nascent business of renting vehicles to drivers operating in the rideshare industry.  The $6 million infusion also was critical to the Company's ambitious plan to go public.

4.      To induce this investment, the Company issued to Bellridge Capital a warrant to purchase up to 1.5 million shares of its common stock at an exercise price of $4.00 per share.

5.      As a further inducement, the Company expressly agreed in the warrant to certain anti-dilution measures designed to protect Bellridge Capital's upside if the value of the Company's stock declined.  Among other things, the warrant provides that the exercise price would be adjusted downward if the Company subsequently sold shares of its common stock for less than $4.00 per share.  In the event of such a dilutive sale, the warrant provides, the exercise price would be adjusted to an amount equal to 90 percent of that lower per share price.

6.      These anti-dilution provisions were a material, bargained-for benefit of Bellridge Capital's agreement to inject badly needed capital into the Company when few other investors would even consider doing so.  Without those price protections, Bellridge Capital would not have invested $6 million in the Company.

7.      In March 2021, the Company disclosed that a year earlier it sold 1.4 million shares of common stock to an investor for $0.07 per share.  Pursuant to the plain and unambiguous terms of the warrant, this dilutive sale automatically triggered a downward adjustment to the exercise price.

8.      In May 2021, Bellridge Capital sought to exercise its rights under the warrant to purchase 1.5 million shares of the Company's common stock at an adjusted exercise price.

9.      The Company rejected Bellridge Capital's exercise of its rights under the warrant, claiming that in 2019 Bellridge Capital orally consented to the deletion of the core price protection terms.  As a result of this alleged oral modification to the warrant, the Company maintains, the $4.00 exercise price controls.

10.      The Company's claim that Bellridge Capital orally agreed to strip the critically important anti-dilution provisions from the warrant -- a position based solely on the word of El-Batrawi, its disgraced founder who has since been forced out of the Company -- is an amateurishly implausible fabrication.  Bellridge Capital did not orally agree to waive the warrant's crucial anti-dilution provisions.

11.      Moreover, pursuant to the express terms of the warrant, any such modification to the warrant is unenforceable absent Bellridge Capital's written consent.  The Company concedes that Bellridge Capital did not consent in writing to the deletion of the warrant's anti-dilution provisions.

12.      In short, EVmo's bad faith refusal to honor the anti-dilution provisions constitutes a material breach of the warrant.  As a direct result of that breach, Bellridge Capital has sustained damages in an amount exceeding $3 million.

13.      Bellridge Capital brings this action to recover its damages flowing from the Company's breach, plus its reasonable attorneys' fees and costs incurred in enforcing the plain and unambiguous terms of the warrant.

## II.   JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332.  Defendant is a citizen of the States of Delaware and California, and plaintiff is a citizen of neither of those states.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     Venue is proper pursuant to 28 U.S.C. §1391(b)(2) and (3).  The closing on the transaction in which the Company issued the underlying warrant occurred in Manhattan. Further, in the warrant, defendant submitted to the exclusive jurisdiction of the state and federal courts sitting in Manhattan "for the adjudication of any dispute hereunder or in connection herewith[.]"

## III.   THE PARTIES

### A.   Plaintiff

16.     Bellridge Capital is a limited partnership organized and existing under the laws of the State of Delaware.  Maintaining its principal place of business in Fort Lauderdale, Florida, Bellridge Capital is an investment firm specializing in emerging small- and mid-cap companies.

17.     Bellridge Capital LLC, a limited liability company organized and existing under the laws of the State of Florida, is the general partner of plaintiff Bellridge Capital.  Bellridge Capital LLC's sole member is Boris (Robert) Klimov, a resident of Toronto, Canada.

18.     Bay Private Equity, Inc., a Canadian corporation maintaining its principal business in Toronto, Canada, is the sole limited partner of plaintiff Bellridge Capital.

B.     **Defendant**

19.     EVmo is a corporation organized and existing under the laws of the State of Delaware.  It maintains its principal place of business in Beverly Hills, California.

20.     The Company was formed in 2016 as YayYo, LLC, which thereafter was converted into a Delaware corporation.  Originally incorporated as YayYo on or about June 21, 2016, the Company changed its name to Rideshare Rental on or about September 11, 2020.  On or about March 20, 2021, the Company changed its name yet again to EVmo.

IV.     **FACTUAL BACKGROUND**

A.     **The Company's Business Operations**

21.     At all relevant times, the Company was engaged in the business of renting cars to drivers operating in the rideshare industry.

22.     Ridesharing is a service that arranges one-way transportation on short notice.  Through websites and mobile applications, rideshare companies like Uber and Lyft connect passengers seeking a one-time ride with drivers of vehicles that, unlike taxis, cannot legally be hailed on the street.

23.     Many drivers who work in the rideshare industry do not own vehicles that meet the quality and safety standards imposed by rideshare companies.  The Company is in the business of filling that void by offering qualifying vehicles for rent on a weekly, monthly or annual basis to drivers whose personal vehicles do not pass muster.

24.     The Company operates primarily through two wholly-owned subsidiaries:  Rideshare Car Rentals, LLC ("Rideshare Car Rentals") and Distinct Cars, LLC ("Distinct Cars").

25.     Through Rideshare Car Rentals, the Company provides drivers in the rideshare industry with access to an online rideshare vehicle booking platform.

26.     Through Distinct Cars, the Company maintains a fleet of passenger vehicles available for rent to drivers operating in the rideshare economy.

27.     The Company's business plan initially focused on the development of an application through which smartphone users could obtain price comparisons of and book available ridesharing and taxi services, along with select limousine and other public and private transportation services.

28.     Although the Company completed the development of this application, it was unable to roll out the application because its functionality hinged on the availability of data from major rideshare companies.  When those rideshare companies unsurprisingly declined to participate in the venture, the Company's original business model cratered.

29.     This turn of events left the Company in dire financial straits.  By the end of 2016, the Company's assets totaled just $160,675.  Its net income was -$1,017,325. By mid-2017, the Company still had generated no revenue.  Its net loss for the first six months ended June 30, 2017 was $2,591,548.

30.     The Company's financial statement for the period ended June 30, 2017 reflected its precarious financial condition:

> The Company's ability to continue as an ongoing concern for the next twelve months is dependent on its ability to generate sufficient cash flows from operations to meet its obligations, which it has not been able to accomplish to date, and its ability to obtain additional capital financing from investors.  These factors, among others, raise substantial doubt about the ability of the Company to continue as an ongoing concern for a reasonable period of time.

31.     On August 12, 2017, the Company acknowledged the failure of its original business model and announced that it was pivoting to a plan to provide rental vehicles to rideshare drivers.

B.    **The Company's Founder, Ramy El-Batrawi**

32.    Developing and maintaining a fleet of rental vehicles is an extremely capital intensive enterprise.  From the outset, the Company faced significant obstacles to raising that capital.  Among the most challenging of those hurdles was El-Batrawi, the Company's founder, chief executive officer and majority shareholder.

33.    In 2006, El-Batrawi and other officers, directors and associates of Genesis Intermedia, Inc. ("GENI") were named as defendants in an SEC enforcement action captioned SEC v. El-Batrawi, Case No. 2-06-cv-02247-MRP, and filed in the United States District Court for the Central District of California (the "GENI Enforcement Action").

34.    GENI at the time was a telemarketing company controlled by El-Batrawi.  El-Batrawi was GENI's majority shareholder, and served as its chief executive officer, president and chairman of the board.

35.    The GENI Enforcement Action arose out of a stock loan and manipulation scheme.  El-Batrawi and the others were alleged to have violated the antifraud provisions of the federal securities laws by scheming to manipulate the price of GENI stock.  One of El-Batrawi's co-defendants was Adnan M. Khashoggi, the international arms dealer implicated in the Iran-Contra scandal with whom El-Batrawi had a long-standing business association.

36.    The SEC alleged that El-Batrawi's scheme artificially inflated GENI's stock price by approximately 1,400 percent.

37.    The final consent judgment resolving the GENI Enforcement Action in 2010 barred El-Batrawi from serving as an officer or director of any public company for five years.

38.     The GENI Enforcement Action was not the only litigation to ensnare El-Batrawi.  In or about 2015, he was named as a defendant in a Racketeer Influenced and Corrupt Organization Act action captioned <u>Keshishyan v. El-Batrawi</u>, Case No. 2:15-cv-4354 JAK, and filed in the United States District Court for the Central District of California. The <u>Keshishyan</u> action arose out of plaintiffs' investment in what El-Batrawi represented would be a multi-level marketing company formed to sell a diet product.

39.     In <u>Keshishyan</u>, El-Batrawi was alleged to have defrauded plaintiffs by, among other things, using subscription materials presented as the work product of Latham & Watkins LLP even though that law firm had no involvement in the transaction.

40.     Plaintiffs in <u>Keshishyan</u> further alleged that they discovered El-Batrawi's fraudulent scheme after he suffered "an apparent mental breakdown and was found wandering the streets naked and yelling, 'Kill me.'"  This incident, plaintiffs alleged, resulted in El-Batrawi's involuntary admission to a hospital "under a psychological hold."

### C.     Bellridge Capital Invests $6 Million in the Company's Struggling Business

41.     By late 2017, the Company was in desperate need of capital to finance its plan to amass a fleet of rental cars and then market those vehicles for rent to rideshare drivers.

42.     In December 2017, Bellridge Capital made a $222,222 bridge loan to YayYo.  YayYo issued a senior secured promissory note to Bellridge Capital in the original principal amount of $222,222 (the "First Note") set to mature on March 31, 2018.

43.     The $222,222 loan was critical to the Company's business plan. The Company represented that the loan proceeds would be used as a down payment for the fleet of cars it would rent to rideshare drivers.

44.     As an inducement for plaintiff to extend this loan, YayYo granted Bellridge Capital a security interest in all of YayYo's assets, including a pledge of securities YayYo owned in its wholly-owned subsidiaries.

45.     Bellridge Capital also received one share of the Company's common stock for every $13.33 loaned.

46.     In early 2018, Bellridge Capital agreed to make an additional $6 million capital infusion into YayYo that was critical to the Company's drive to have its common stock listed on the Nasdaq Capital Market ("Nasdaq").  This $6 million lifeline, the Company represented, was earmarked to support the Company's development of the fleet of rental cars that would be the backbone of its operations.

### 1.     The Purchase Agreement

47.     Specifically, on March 8, 2018, YayYo entered into a Securities Purchase Agreement (the "SPA") with Bellridge Capital.

48.     Pursuant to the SPA, Bellridge Capital purchased both a $6 million promissory note and a warrant to acquire up to 1.5 million shares of the Company's common stock.

49.     The SPA at Section 9(e) provides that "[n]o provision of this Agreement may be amended other than by an instrument in writing signed by" the Company and Bellridge Capital.

### 2.     The Second Note

50.     As part of its investment in the Company, Bellridge Capital obtained a senior secured promissory note in the principal face amount of $6 million due March 8, 2023 (the "Second Note").

51.     The Second Note provided that the "prior written consent of [Bellridge Capital] shall be required for any change, waiver or amendment of this Note."

**3.      The Warrant**

52.     In a warrant dated March 8, 2018 (the "Warrant"), Bellridge Capital secured the right to purchase up to 1.5 million shares of YayYo's common stock for an aggregate purchase price of $6 million.  A true and correct copy of the Warrant is attached hereto as Exhibit A.

53.     A warrant is a security providing the holder with the right (but not the obligation) to buy the underlying stock of the issuing company at a fixed price at some future time prior to the expiration of the warrant.

54.     Pursuant to the Warrant, the Company granted to Bellridge Capital the right to purchase up to an aggregate of 1.5 million shares (the "Warrant Shares") of the Company's common stock at $4.00 per share (the "Exercise Price") at any time up to March 8, 2023 (the "Expiration Date").  See Exhibit A, §§1, 19.

55.     Given the Company's precarious financial condition and its unproven business model, Bellridge Capital negotiated for and secured a number of critical anti-dilution provisions set forth in Section 2 of the Warrant.  There, the Company agreed that the Exercise Price and number of Warrant Shares issuable upon the exercise of the Warrant were subject to adjustment under certain conditions.

56.     Pursuant to Section 2(b) of the Warrant, if the Company issued or sold any shares of common stock for a consideration per share (the "New Issuance Price") less than the Exercise Price in effect immediately prior to the issuance or sale (a "Dilution Issuance"), then the Exercise Price "shall be reduced to an amount equal to 90% of the New Issuance Price."

57.     Specifically, the Warrant provides:

> If and whenever on or after the Subscription Date, the Company
> issues or sells, or in accordance with this Section 2 is deemed to
> have issued or sold, any shares of Common Stock . . . for a
> consideration per share (the "**New Issuance Price**") less than a
> price equal to the Exercise Price in effect immediately prior to
> such issuance or sale or deemed issuance or sale (such Exercise
> Price then in effect is referred to herein as the "**Applicable Price**")
> (the foregoing a "**Dilutive Issuance**"), then immediately after such
> Dilutive Issuance, the Exercise Price then in effect shall be reduced
> to an amount equal to 90% of the New Issuance Price.

Id., §2(b) (emphasis in original).

58.     In addition, Section 2(c) provides that simultaneously with any adjustment to the Exercise Price, the number of Warrant Shares that may be purchased upon the excise of the Warrant would be increased or decreased proportionally so that after the adjustment the aggregate Exercise Price payable for the adjusted number of Warrant Shares would be the same as the Exercise Price in effect immediately prior to that adjustment.

59.     Further, Section 2(f) provides that in the event the Company took any action to which the express provisions of Section 2 did not strictly apply or, if applicable, would not operate to protect Bellridge Capital from dilution, then the Company's board of directors "shall in good faith determine and implement an appropriate adjustment in the Exercise Price and the Warrant Shares (if applicable) so as to protect" Bellridge Capital's rights.

60.     The price protections memorialized in Section 2 were material terms of Bellridge Capital's bargain with the Company.  But for those price protections, Bellridge Capital would not have invested $6 million in the Company.

61.     Significantly, the Warrant expressly prohibits any oral modification to its terms.  Section 9 of the Warrant, captioned "AMENDMENT AND WAIVER," in relevant part provides:

> [T]he provisions of this Warrant . . . may be amended and the
> Company may take any action herein prohibited, or omit to

perform any act herein required to be performed by it, only if the
Company has obtained the written consent of [Bellridge Capital].
No waiver shall be effective unless it is in writing and signed by an
authorized representative of the waiving party.

62.     Section 15 of the Warrant provides that if "this Warrant is placed

in the hands of an attorney for collection or enforcement or is collected or enforced through any

legal proceeding or the holder otherwise takes action to collect amounts due under this Warrant

or to enforce the provisions of this Warrant," then "the Company shall pay the costs incurred by

the Holder for such collection, enforcement or action … including, without limitation, attorneys'

fees and disbursements."

63.     The Warrant is governed by New York law.  Id., §11.

64.     In the Warrant, the Company "irrevocably submit[ted] to the

exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of

Manhattan, for the adjudication of any dispute hereunder or in connection herewith[.]"  Id.

**D.     The IPO**

65.     Notwithstanding Bellridge Capital's $6 million investment, the

Company's financial condition remained dire.  As of March 26, 2018, the Company's net income

was -$4.1 million.  Revenue for the three months ended March 31, 2018 was just $418,879.  For

that same period, the Company operated at a net loss of $1.5 million.  That net loss reflected an

increase of 150 percent over the same period in 2017.

66.     Under the circumstances, the Company desperately needed to raise

capital to survive.

67.     On April 30, 2018, YayYo filed a registration statement with the

SEC on Form S-1 (as amended, the "Registration Statement") for an initial public offering of up

to 1.65 million shares of its common stock (the "IPO"). Therein, the Company stated that it intended to have its common stock approved for listing on Nasdaq.

68.  Ultimately, the Registration Statement required no fewer than fifteen amendments before the SEC declared it effective.

69.  In the first of those amendments, filed with the SEC on Form S-1/A on June 6, 2018, the Company publicly disclosed the Warrant and attached it thereto as Exhibit 4.3. A true and correct copy of this amended Registration Statement, with Exhibit 4.3, is attached hereto as Exhibit B.

70.  On or about September 12, 2018, the Company entered into a new note payable agreement with Bellridge Capital pursuant to which YayYo repaid $4,821,810 of the original $6 million Second Note.

71.  Consistent with the terms of the Second Note, this modification was memorialized in a formal agreement. Pursuant to this written agreement, the balance of $1,178,190 plus an original issue discount of $117,828 was rolled into a note payable for $1,296,018 due on the earlier of November 30, 2019 or the Company's closing on an offer of its common stock of at least $3 million.

72.  As the Company proceeded in the fall of 2018 with its preparations for the IPO, Nasdaq repeatedly expressed strong reservations about listing YayYo's shares given El-Batrawi's blemished track record and the degree to which he remained in control of the Company.

73.  Upon information and belief, Nasdaq insisted that El-Batrawi resign and retain less than a ten percent stake in YayYo as a condition to the Company going public. The Company and El-Batrawi feigned their commitment to complying with those

conditions.  El-Batrawi claimed to resign as the Company's chief executive officer on or about October 4, 2018.

74.     In September 2019, El-Batrawi once again represented that he was stepping away from the Company, certifying that he was resigning from all of his positions.

75.     The modifications to the terms of the Second Note were disclosed in the fourteenth amendment to the Registration Statement filed with the SEC on Form S-1/A on November 5, 2019.  The written Amendment to Note Payable Agreement, dated effective November 1, 2019 and signed by both parties, was annexed as Exhibit 10.21.1 to that amended Registration Statement.  A true and correct copy of this amended Registration Statement, with Exhibit 10.21.1, is attached hereto as Exhibit C.

76.     Significantly, unlike the modifications to the Second Note, the modifications allegedly made to the Warrant in or about November 2019 were not disclosed in any iteration of the Registration Statement.

77.     The fifteenth and final amendment to the Registration Statement was filed with the SEC on Form S-1/A on November 6, 2019.  A true and correct copy of this amended Registration Statement, with Exhibit 4.3, is attached hereto as Exhibit D.

78.     In this November 6 amendment to the Registration Statement, the Company made no reference to any modified warrant; instead, it incorporated by reference the Warrant attached to the initial June 7, 2018 amendment with all of the anti-dilution provisions intact.  See Exhibit D at II-7.

79.     The Registration Statement finally was declared effective on or about November 12, 2019.  The 1.5 million shares of common stock underlying the Warrant were registered as part of the IPO.

80.     On November 12, 2019, YayYo's common stock began trading on Nasdaq under the symbol "YAYO."  Upon information and belief, "yayo" is a Spanish slang term for cocaine.

81.     On November 15, 2019, the Company closed its offering of 2,625,000 common shares at $4.00 per share.

82.     Total gross proceeds from the IPO were $10.5 million.  The $1,296,018 note payable due to Bellridge Capital was paid in full from those proceeds.  In or about November 2019, the Company also repaid the $222,222 bridge loan secured by the First Note.

83.     Remarkably, two days after the IPO closed, the Company appointed El-Batrawi as its acting chief executive officer.

**E.     Post-IPO Litigation Shines a Spotlight on
Grossly Improper Conduct at the Company**

84.     The IPO was followed by a wave of litigations arising out of a pattern of deceitful misconduct by El-Batrawi, who is the linchpin in the Company's implausible assertion here that Bellridge Capital orally agreed to strip the anti-dilution provisions from the Warrant.

85.     On January 24, 2020, YayYo took the extraordinary step of seeking injunctive relief against its founder in an action captioned YayYo, Inc. v. El-Batrawi, Case No. 20 STCP00309, and commenced in the Superior Court of the State of California, County of Los Angeles.  Therein, YayYo sought to enjoin El-Batrawi's "wrongful conduct in misrepresenting his position in, association with, and authority on behalf of YayYo."

86.     YayYo alleged:

Despite leaving the Company following concerns from NASDAQ
regarding his involvement in the day-today operations of YayYo in

September 2019, [El-Batrawi] has engaged in a continuous course
of actions misrepresenting himself as affiliated with, speaking on
behalf of, and authorized or empowered by YayYo.  In so doing,
[El-Batrawi] has purported to bind the Company to contracts,
direct its employees, change its website, and even attempted to sell
the Company to its competitors.

87.     YayYo asserted that El-Batrawi engaged in "wrongful acts against

YayYo to disrupt and harm YayYo's business."

88.     YayYo alleged that in September 2019, El-Batrawi had

"relinquished all formal and informal association with the Company following the receipt of

concerns, from NASDAQ, regarding [El-Batrawi's] involvement with the Company's day-to-day

operations[.]"  Since that resignation in September 2019, YayYo maintained, El-Batrawi "has

engaged in a continuous and escalating pattern of behavior destructive to YayYo[.]"

89.     YayYo sought an order barring El-Batrawi from holding himself

out as an officer or director of the Company; purporting to take any corporate action on behalf of

the Company; or selling, transferring or encumbering any of the Company's assets.

90.     In a declaration filed in support of YayYo's application for a

temporary restraining order against El-Batrawi, Jonathan Rosen, the Company's new chief

executive officer, stated that despite resigning as chief executive officer and promising to have

no formal or informal affiliation with the Company other than his minority stake, El-Batrawi

"continue[d] to operate and hold himself out as if a director or officer of YayYo, or as an

otherwise authorized representative of the same."

91.     Rosen further stated that despite representations in the Registration

Statement to the effect that El-Batrawi already had sold his 12,525,000 shares of YayYo stock

prior to the IPO, in reality "El-Batrawi ha[d] failed and/or refused to sell his shares of stock in

the Company[.]"

92.     According to Rosen, El-Batrawi engaged in a pattern of deceptive misconduct between September 2019 and January 2020 -- the same time period in which here El-Batrawi purportedly secured Bellridge Capital's oral consent to deleting the Warrant's anti-dilution provisions.

93.     El-Batrawi's misconduct, Rosen alleged, included contacting competitors, suppliers and vendors of YayYo and negotiating with them as a representative of YayYo; meeting with financiers and investment firms about investing in YayYo and claiming to represent YayYo; hiring a public relations firm for YayYo and producing and airing commercials for YayYo; attempting to hire two marketing firms for YayYo; and directing that changes be made to YayYo's website.

94.     Within days after YayYo commenced this litigation targeting El-Batrawi's improper conduct, the Company -- presumably at El-Batrawi's direction -- cleaned house.  YayYo replaced three board members and announced that Rosen had resigned as chief executive officer.  Incredibly, El-Batrawi was reinstated as the Company's chief executive officer.  YayYo at the time stated:

> Mr. Rosen informed the Board that his resignation was for "Good Reason," as that term is defined in Mr. Rosen's employment agreement with the Company dated January 10, 2020.  The Company disagrees with Mr. Rosen's characterization of the circumstances surrounding his resignation and does not believe that "Good Reason" exists for Mr. Rosen's resignation.

95.     This house cleaning was too late to deflect the attention of regulators.

96.     Nasdaq quickly took note of these allegations that, despite the Company's representations that El-Batrawi had removed himself from YayYo's day-to-day

operation as a condition to proceeding with the IPO, he continued to exercise control over those operations.  Nasdaq raised its concerns directly and forcefully with the Company.

97.    On February 10, 2020, the Company notified Nasdaq of its intention to "voluntarily" delist its common stock from Nasdaq.  It did so after Nasdaq advised the Company that it had failed the conditions for continued listing of its common stock as set forth in Listing Rule 5250(a).

98.    The Company disclosed no details regarding its noncompliance with Rule 5250(a).  Rule 5250(a), however, in relevant part provides:

> Nasdaq may request any additional information or documentation, public or non-public, deemed necessary to make a determination regarding a Company's continued listing, including, but not limited to, any material provided to or received from the Commission or other Regulatory Authority.  A company may be denied continued listing if it fails to provide such information within a reasonable period of time or if any communication to Nasdaq contains a material misrepresentation or omits material information necessary to make the communication to Nasdaq not misleading.  The Company shall provide full and prompt responses to the requests by Nasdaq or by FINRA acting on behalf of Nasdaq for information related to unusual market activity or to events that may have a material impact on trading of its securities in Nasdaq.

99.    The Company's delisting did not stem the flood of litigation flowing from El-Batrawi's deceitful conduct.  On March 5, 2020, Anthony Davis, YayYo's former president, chief executive officer and director, commenced an action captioned <u>Davis v. YayYo, Inc.</u>, Case No. 20STCV09143, in the Superior Court of the State of California for the County of Los Angeles.

100.    In his complaint for breach of contract and fraud, Davis alleged:

> Plaintiff Anthony Davis is an experienced, c-suite level executive that agreed to join Yayyo [sic], a ridesharing startup company, as its CEO, for a salary well below his market rate in exchange for the written promise of stock options made by Yayyo [sic] founder and then CEO Ramy El-Batrawi.

After only five (5) months of service and in accordance with his responsibilities under an employment agreement, Plaintiff determined that Ramy El-Batrawi could not be trusted because he regularly ignored legal counsel regarding SEC matters and flouted Board protocols and industry norms for corporate compliance. Specifically, El-Batrawi filed fraudulent and materially misleading documents with the SEC that Yayo [sic] continues to use to deny Plaintiff the compensation he is owed.

101.   Davis asserted that El-Batrawi fabricated documents:

Plaintiff is informed and believes and thereupon alleges that sometime in 2016, El-Batrawi drafted documents that contained equity/stock compensation terms that were never presented to the Board for consent or review. On December 23, 2016, El-Batrawi caused to be filed, under Davis' name and signature, and without his consent or knowledge, a document that contained the term Equity Incentive Plan (hereinafter the "Fabricated Equity Incentive Plan") that was purportedly adopted on November 29, 2016. This date was very same day Davis accepted the Davis' Offer Letter. No Board meeting was held on November 29, 2016 that addressed the Fabricated Equity Incentive Plan, or any incentive plan for that matter. El-Batrawi caused this document to be filed without the approval or knowledge of Yayyo's [sic] Board of Directors.

Davis would never have agreed to this Fabricated Equity Incentive Plan, as the expiration period was significantly too short to allow for his options to be realized, rendering the compensation terms in their respective Offer Letters illusory.

***

The November 2016 Fabricated Equity Incentive Plan was never presented or adopted by the Board as represented in the filing with the SEC, which makes it misleading to the public and creates conflict and liabilities for Yayyo [sic] as Plaintiff is informed and believes that El-Batrawi was acting in his own interest and not in that of the company.

102.   Davis further alleged that on March 15, 2017, the Company filed a

document with the SEC containing the correct information regarding his stock and equity

options, but then subsequently referenced the fabricated November 2016 incentive plan.

103.    Davis also alleged that he notified the Company that it had filed false statements with the SEC:

> Throughout 2018 and 2019, without the assistance of legal counsel, written notice was provided to Yayyo's [sic] then CEO Laurie DiGiovanni and El-Batrawi that certain filings (e.g., the Fabricated Equity Incentive Plan) with the SEC contained materially false statements, and that these false material statements, through Yayyo's [sic] current legal counsel, have been used to deny Plaintiff his compensation and stock options in Yayyo [sic] owed under his employment agreement.  To date, Yayyo [sic] and its current counsel continue to file and maintain positions that deceive the public and deny Plaintiff the compensation he is owed.

104.    On or about April 28, 2020, FirstFire Global Opportunities Fund, LLC ("FirstFire") filed an action captioned FirstFire Global Opportunities Fund, LLC v. West Park Capital, Inc., Case No. 1-20-CV-03327-LLS, in the United States District Court for the Southern District of New York.  Therein, FirstFire alleged that the Registration Statement was materially false and misleading.

105.    In FirstFire, plaintiff alleged that when the Company encountered difficulties generating sufficient investor interest in the IPO, El-Batrawi in October or November 2019 "became materially involved in efforts to close the Offering and/or obtain additional indications of interest for the YAYO securities, assisting and often working daily at the office of [the underwriters] and in violation of the NASDAQ listing requirements."

106.    FirstFire also alleged that when the underwriters for the IPO were unable to raise the $10 million required by Nasdaq to close the IPO, El-Batrawi fabricated a $1.2 million indication of interest that he knew was not bona fide.

107.    Beginning in or about July 2020, multiple putative securities class actions were commenced against the Company on behalf of persons who purchased or otherwise acquired stock through the IPO.

108.     In their pleadings, the investors focused on El-Batrawi's "checkered past[.]"  They alleged that the Company made a series of false and misleading statements, or omitted material information, from the Registration Statement filed in connection with the IPO.

109.     Among other things, the investors alleged that, despite his purported resignation prior the IPO, El-Batrawi continued to control the Company.

### F.     El-Batrawi Is Ousted from the Company for Good

110.     Notwithstanding these allegations of gross misconduct by El-Batrawi, the Company on February 28, 2020 reappointed him as its chief executive officer and a member of its board of directors.  His tenure would prove to be short-lived, and it did nothing to bolster the Company's prospects.

111.     For the three months ended March 31, 2020, the Company recorded a net loss of $1.76 million.  Its net loss for the year ended December 31, 2020 was $3.5 million.

112.     From January 1, 2020 through December 31, 2020, the reported closing price of the Company's common stock on the Pink Open Market fluctuated between $0.08 and $1.44 per share.

113.     On February 26, 2021, X, LLC, an entity owned and controlled by El-Batrawi, sold six million shares of the Company's common stock to Acuitas Group Holdings, LLC ("Acuitas Group").  Acuitas Group is the personal holding company of entrepreneur Terren Peizer, who The New York Times has labeled the "Zelig of Wall Street" due to his substantial investments in a wide range of industries.

114.     As a result of this transaction, Acuitas Group became the largest holder of the Company's common stock and Peizer joined the Company's board as its new executive chairman.

115.     As a condition to consummating this transaction, Peizer demanded that El-Batrawi resign as chief executive officer and as a director of the Company.

116.     During the first three months of 2021, the Company sold 825,000 shares to Acuitas Group in connection with a settlement agreement between Acuitas Group and El-Batrawi's X, LLC.

117.     In the wake of El-Batrawi's ejection from the business he founded, the Company continued to struggle.  Its net loss for the three months ended March 31, 2021 was $4.4 million, a 150 percent increase compared to the same period a year earlier.

118.     In its SEC Form 10-Q for the quarter ending March 31, 2021, the Company painted a grim picture:

> Since inception, our principal sources of operating funds have been proceeds from equity financings, including the sale of our Common Stock to initial investors known to management and principal shareholders of the Company. We do not expect that our current cash on hand will fund our existing operations and future business growth. We will need to raise additional capital in order execute our business plan and growth goals for at least the next twelve-month period thereafter.  If the Company is unable to raise sufficient additional funds, it will have to execute a slower than planned growth path, reduce overhead and scale back its business plan until sufficient additional capital is raised to support further operational expansion and growth.  As of March 31, 2021, the Company had $155,476 in cash.  The Company generated $77,212 of cash for operating activities for the three months ended March 31, 2021.  The Company is seeking to raise additional capital.  If the Company is not successful in raising additional capital it will be forced to significantly scale back its business operations and it growth plans.

G.   **The Company Refuses to Honor Bellridge Capital's**
**Exercise of Its Rights Under the Warrant**

119.   In its Form 10-Q filed with the SEC on or about August 5, 2020, the Company disclosed that during the three months ended June 30, 2020, it sold an aggregate of 2,553,571 shares of common stock to three investors for cash proceeds of $25,000 -- or $0.0097 per share.

120.   The sale of 2,553,571 shares of common stock for $25,000 constituted a Dilutive Issuance under the Warrant, which Bellridge Capital initially maintained required a downward adjustment of the Exercise Price to $0.0088, or 90 percent of the $0.0097 per share price.

121.   On May 28, 2021, Bellridge Capital forwarded to EVmo a formal notice of its exercise of its rights under the Warrant ("Exercise Notice") to purchase 1.5 million shares of the Company's common stock at the adjusted Exercise Price of $0.0088.  A true and correct copy of this Exercise Notice is attached hereto as Exhibit E.

122.   Bellridge Capital was stunned when EVmo spurned this exercise of its rights under the Warrant.  The Company advised Bellridge Capital that "[p]er Ramy [El-Batrawi] and per the signed agreement, the warrant exercise price was fixed at $4.00."  To Bellridge Capital, it appeared that the Company was unaware of -- or simply ignoring -- the Warrant's anti-dilution provisions.

123.   After pressing for an explanation, Bellridge Capital was gobsmacked when the Company for the first time maintained that Bellridge Capital previously had orally agreed with El-Batrawi to delete the price protections from Section 2 of the Warrant.

124.     Specifically, the Company maintains that at or about the time of the IPO in November 2019, El-Batrawi secured Bellridge Capital's oral consent to delete the anti-dilution provisions from the Warrant.

125.     True to his track record of deceitful conduct, El-Batrawi's account of an oral modification to the Warrant is a complete fabrication.  The Company's position, based solely on El-Batrawi's account, is baseless.

126.     Bellridge Capital did not agree orally to delete the Warrant's anti-dilution provisions.

127.     In any event, any oral consent to such an amendment is invalid and unenforceable.  The Warrant expressly provides that its terms may be amended "only if the Company has obtained the written consent" of Bellridge Capital.  See Exhibit A, §9.

128.     The Company concedes that Bellridge Capital did not provide written consent to the alleged modifications to the Warrant.

129.     In an ill-conceived cover story designed to justify its wrongful refusal to honor Bellridge Capital's exercise of its rights under the Warrant, the Company relies upon a "Form of Warrant" buried as Exhibit 4.3 deep within its 2019 Annual Report submitted to the SEC on March 31, 2020 on Form 10-K ("2019 Annual Report").  A true and correct copy of the 2019 Annual Report, with Exhibit 4.3, is attached hereto as Exhibit F.

130.     Exhibit 4.3 to the 2019 Annual Report purports to be a modified version of the Warrant.  In this document, the anti-dilution provisions of the Warrant are all deleted and flagged as having been "Intentionally omitted."  See Exhibit F at 6.

131.    Bellridge Capital never consented or agreed to those deletions or omissions.  Indeed, Bellridge Capital never even saw the modified "Form of Warrant" until after May 2021 when the Company rejected its attempt to exercise its rights under the Warrant.

132.    The "Form of Warrant" attached to the 2019 Annual Report was signed by El-Batrawi in or about November 2019 -- i.e. the time period in which, as detailed above, the Company and others have alleged that El-Batrawi was engaged in an extensive pattern of misconduct, including making material misrepresentations and fabricating documents.

133.    Bellridge Capital did not sign the "Form of Warrant" attached as Exhibit 4.3 to the 2019 Annual Report, nor does that "Form of Warrant" otherwise reflect Bellridge Capital's written consent to the alleged modification.

134.    The 2019 Annual Report itself makes no reference to any modifications to the Warrant.  The text of the 2019 Annual Report does not even reference the "Form of Warrant" attached as Exhibit 4.3 thereto.

135.    At pages 38-39 of the 2019 Annual Report, the Company references the Warrant but states nothing about any modifications to that instrument.

136.    The same is true of the discussions of the Warrant at pages 48, 64 and 80 of the 2019 Annual Report.  There, the Company says nothing about any modifications to the Warrant nor does it reference Exhibit 4.3.  Moreover, in the discussion of the Warrant at page 48 of the 2019 Annual Report, the Company noted the exercise price adjustments provided for in Section 2 of that instrument -- i.e., the provisions deleted from the bogus "Form of Warrant."

137.    El-Batrawi signed the 2019 Annual Statement on the Company's behalf.  Id. at 88.

138.    No mention of any modifications is included in the Company's discussion of the Warrant on Exhibit 4.1 of its Annual Report for 2020 submitted to the SEC on or about March 31, 2021 on Form 10-K ("2020 Annual Report").  A true and correct copy of the 2020 Annual Report, with Exhibit 4.1, is attached hereto as Exhibit G.

139.    Tellingly, the 2020 Annual Report incorporates by reference the legitimate Warrant attached as Exhibit 4.3 to the amended Registration Statement filed on June 7, 2018, not the fabricated "Form of Warrant" attached to the 2019 Annual Report.  See Exhibit G at 33.

140.    El-Batrawi did not sign the 2020 Annual Report on the Company's behalf; instead, it was signed by EVmo's new chief executive officer, Stephen M. Sanchez.  Id. at 35.

141.    In the end, the Company's convenient cover story of an oral modification to the Warrant simply does not hold up.  The fact is that, in or about November 2019, the Company was under intense pressure from the IPO's underwriters to strike the Warrant's anti-dilution provisions.  Those provisions, the underwriters warned the Company, would doom the IPO to failure.

142.    Working shoulder-to-shoulder with the underwriters and desperate to salvage the IPO, El-Batrawi in or about November 2019 simply claimed to have secured Bellridge Capital's oral consent to delete the anti-dilution provisions.  Incredibly given his history of deceptions and fabrications, the Company accepted -- or at least now claims to accept -- El-Batrawi's account to be true.

143.     Months after El-Batrawi concocted this ruse, the bogus "Form of Warrant" was buried deep within the 2019 Annual Report as an exhibit without any narrative disclosure of the alleged modifications to the Warrant reflected in that exhibit.

144.     Attempting to justify its refusal to honor the Warrant, the Company in June 2021 acknowledged to Bellridge Capital the pressure it was under in late 2019 to delete the anti-dilution provisions as a condition to proceeding with the IPO.

145.     Striking the Warrant's price protections, the Company advised Bellridge Capital, "was a condition to our underwriters entering into the underwriting agreement and our auditor issuing their consent.  We would not have been able to go public otherwise."

146.     There is one fatal problem with the Company's decision to cave to the underwriters' demands and claim to modify the material terms of the Warrant:  Indisputably, it never secured the required written consent of Bellridge Capital.

147.     In short, the "Form of Warrant" attached as Exhibit 4.3 to the 2019 Annual Statement is a transparent and wholly ineffective sham.

148.     Since forwarding its Exercise Notice to EVmo in May 2021, Bellridge Capital recalculated the adjusted Exercise Price based on additional disclosures the Company made in the 2020 Annual Report.

149.     In the 2020 Annual Report, the Company provided further details regarding the sales that triggered the anti-dilution provisions.  In the earliest of those three transactions on April 2, 2020, the Company reported, it sold 1,428,571 shares to ACME Auto Leasing ("ACME"), an entity that finances the Company's vehicle purchases.  Id. at 10.

150.     The Company sold those shares to ACME at $0.07 per share, for aggregate cash consideration of $100,000.  Id.

27

151.    This transaction with ACME constituted a Dilutive Issuance under the Warrant, effectively adjusting the Exercise Price downward to $0.063, or 90 percent of the $0.07 per share sale price.

152.    Pursuant to the plain and unambiguous terms of the Warrant, Bellridge Capital is entitled to exercise its warrant to purchase 1.5 million shares of the Company's common stock at the adjusted Exercise Price of $0.063 for total consideration of $94,500, rather than the $6 million purchase price that EVmo insists upon in reliance on the unadjusted $4.00 Exercise Price.

<u>**COUNT I**</u>
**(Breach of Contract)**

153.    Bellridge Capital repeats and realleges the facts contained in paragraphs 1-152 above as if fully set forth herein.

154.    The Warrant constitutes a valid and enforceable contract between the Company and Bellridge Capital.

155.    Bellridge Capital has fully performed all of its obligations to the Company as set forth in the Warrant.

156.    As alleged above, the Company has materially breached its obligations to Bellridge Capital under Section 2 of the Warrant.

157.    Specifically, the Company's refusal to honor the anti-dilution provisions of the Warrant constitutes a material breach that has deprived Bellridge Capital of one of the most significant bargained-for benefits of its $6 million investment.

158.    The Company's bad faith conduct in response to the Exercise Notice constitutes a material breach of the Warrant even if it is deemed not to violate the anti-dilution provisions of Section 2.  Specifically, the Company has breached Section 2(f) of the

Warrant, which provides that in the event the Company took any action to which the express terms of Section 2 did not strictly apply or, if applicable, would not operate to protect Bellridge Capital from dilution, then EVmo's board of directors "shall in good faith determine and implement an appropriate adjustment in the Exercise Price and the Warrant Shares (if applicable) so as to protect" Bellridge Capital.

159.   The Company's insistence on the $4.00 Exercise Price under the circumstances alleged above constitutes a clear breach of Section 2(f).

160.   As a direct result of the Company's material breach of the terms of the Warrant, Bellridge Capital has sustained damages in an amount exceeding $3 million.

WHEREFORE, plaintiff Bellridge Capital, LP hereby demands judgment in its favor and against defendant EVmo, Inc. as follows:

A.   Awarding Bellridge Capital its damages flowing from the Company's breaching conduct in an amount to be proven at trial but believed to exceed $3 million;

B.   Awarding Bellridge Capital its costs of suit and attorneys' fees pursuant to Section 15 of the Warrant; and,

C.   Granting Bellridge Capital such other and further relief as the Court deems just and proper.

Dated: New York, New York
       August 23, 2021

KELLEY DRYE & WARREN LLP

By:    */s/ William S. Gyves*
      William S. Gyves
      Glenn T. Graham
      Robert N. Ward

3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel.: (212) 808-7800
Fax: (212) 808-7897
wgyves@kelleydrye.com
ggraham@kelleydrye.com
rward@kelleydrye.com

Attorneys for Plaintiff