UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BELLRIDGE CAPITAL, LP,

                Plaintiff,

-v-

EVMO, INC. F/K/A YAYYO, INC.,

                Defendant.

CIVIL ACTION NO.: 21 Civ. 7091 (PGG) (SLC)

**OPINION AND ORDER**

**SARAH L. CAVE**, United States Magistrate Judge.

## I. INTRODUCTION

Before the Court in this breach of contract action are the objections of Plaintiff Bellridge Capital, LP ("Bellridge") to the privilege designations by Defendant EVmo, Inc., f/k/a Yayyo, Inc. ("EVmo" or the "Company"), which the Court construes as a motion to compel. (ECF No. 70 (the "Motion")). For the reasons set forth below, the Motion is DENIED.

## II. BACKGROUND

### A. Factual Background

The following factual summary is drawn from the Complaint, the allegations of which the Court presumes as true for purposes of the Motion, and the parties' submissions in connection with the Motion. (ECF Nos. 1; 1-1; 70; 70-1 – 70-22; 74; 74-1 – 74-5).

In March 2018, Bellridge invested $6 million in EVmo, which was in the business of renting vehicles to rideshare drivers. (ECF No. 1 ¶¶ 1–3). A component of Bellridge's investment in EVmo was a warrant to purchase up to 1.5 million shares of the Company's common stock at an exercise

1

price of $4.00 per share.  (ECF Nos. 1 ¶ 4; 1-1 (the "Warrant"); see ECF No. 74-1 at 43–44, 53).[1]  The Warrant, which was to expire in March 2023, included "certain anti-dilution measures designed to protect Bellridge['s] [] upside if the value of the Company's stock declined[,]" for example, that the "exercise price would be adjusted downward if the Company subsequently sold shares of its common stock for less than $4.00 per share."  (ECF No. 1 ¶ 5 (the "Anti-Dilution Provisions"); see ECF Nos. 1-1 at 10–16; 74-1 at 43–44).  Bellridge alleges that the "[A]nti-[D]ilution provisions were a material, bargained-for benefit of [its] agreement to inject badly needed capital into the Company when few other investors would even consider doing so[,]" and "[w]ithout those price protections, Bellridge [] would not have invested $6 million in the Company."  (ECF No. 1 ¶ 6).

From June 2016 until February 2019—with the exception of the period between October 4, 2018 and November 17, 2018—Ramy El-Batrawi ("El-Batrawi") was the CEO of EVmo, of which he was also a founder.  (ECF Nos. 70-5 at 2; 70-6 at 65; 70-10 at 3; 74 at 2; 74-1 at 58).  From June 2016 until September 2019, El-Batrawi was also a director of EVmo.  (ECF No. 74-1 at 58).  On February 1, 2019, El-Batrawi resigned as EVmo's CEO, and became a consultant to the Company pursuant to a consulting agreement, which provided that he was "not an officer or executive of the Company and cannot bind the Company to any agreement, understanding or arrangement with any third-party and shall not execute any contract or other document on the Company's behalf."  (ECF No. 70-13 at 2 ¶ 3 (the "Consulting Agreement"); see ECF Nos. 70-11 at 2; 70-12 at 2–3).  El-Batrawi remained a consultant to EVmo until September 1, 2019, when EVmo terminated the Consulting Agreement.  (ECF Nos. 70-17 at 2; 70-18 at 2).

---

[1] At the time the Warrant was issued, EVmo was known as Yayyo, Inc.  (ECF No. 1-1 at 2).

EVmo has asserted in this action that on May 4, 2019, the parties amended the Warrant to modify the Anti-Dilution Provisions (the "Warrant Amendment"). (ECF Nos. 28 ¶ 3; 28-1 at 2 ¶ 2) ("In consideration of good and valuable consideration, as of Effective Date, the [] provisions in 1(c) (ii), 2 (b), 2(d), 2 (e), 2(f) and 4 shall be waived and removed[.]"); 38-1; 74-1 at 95–113 (Warrant, modified by Warrant Amendment, as exhibit to 2021 Form 10-K); see ECF Nos. 38 ¶¶ 9, 149, 154; id. at 20; 74-5 at 2 (Kevin Pickard, EVmo's former Chief Financial Officer ("CFO"), stating that "the anti-dilution language was removed from the warrant agreement so the exercise was fixed at $4.00 per share.")). On May 10, 2019—i.e., after the Effective Date of the Warrant Amendment—EVmo's Chief Financial Officer, Kevin Pickard, sent an email to El-Batrawi listing the provisions of the Warrant he wanted El-Batrawi to ask Bellridge to waive. (ECF No. 84 ("Ramy, Please have Robert waive the following sections of the warrant from inception.")). The parties dispute the date the Warrant Amendment was executed, and whether it was executed at all. (ECF Nos. 1 ¶¶ 123–26; 28 ¶ 3; 38 ¶¶ 123–26; 85 at 6, 12–13).

In February 2020, El-Batrawi resumed his role of CEO of EVmo, a position he held until February 1, 2021, when he resigned as CEO and director of EVmo. (ECF Nos. 70-1 at 4; 70-22; 74-3 at 27). El-Batrawi has submitted a declaration in this action stating that "[a]t all times herein relevant, I was authorized to act on behalf of EV[mo,]" and that, during May 2019, "Robert Klimov, [Bellridge's] Managing Partner[,] . . . delivered to [him] a fully executed[] copy of" the Warrant Amendment. (ECF No. 28 ¶¶ 2–3 (the "Declaration")). Klimov has denied agreeing to modify the Warrant, (ECF No. 33 ¶ 5), and Bellridge asserts that it "has developed compelling evidence" that the Warrant Amendment "is a fabrication." (ECF No. 70 at 2).

3

In March 2021, EVmo "disclosed that a year earlier it sold 1.4 million shares of common stock to an investor for $0.07 per share[,]" which, Bellridge alleges, was a "dilutive sale [that] automatically triggered a downward adjustment to the exercise price."  (ECF No. 1 ¶ 7).  On May 28, 2021, Bellridge sent an "Exercise Notice[,]" seeking to exercise its right to purchase up to 1.5 million shares of EVmo common stock.  (ECF No. 1-5 (the "Exercise Notice"); see ECF Nos. 1 ¶ 8; 74 at 2).  EVmo "rejected Bellridge['s] exercise of its rights under the [W]arrant, claiming that in 2019 Bellridge [] orally consented to the deletion of the core price protection terms[]" such that "the $4.00 exercise price controls."  (ECF No. 1 ¶ 9; see ECF No. 70 at 2).  EVmo asserts that, on receiving the Exercise Notice, "EVmo was immediately on notice about the potential for litigation with Bellridge."  (ECF No. 74 at 2).

After EVmo rejected the Exercise Notice, the parties attempted to resolve their dispute "short of litigation" by engaging in "follow-up calls and emails" in which Bellridge disclaimed any knowledge of the Warrant Amendment.  (ECF No. 78 at 9–10).  El-Batrawi participated in these discussions, some of which were "angry communications" with Klimov.  (Id. at 10–11).  Settlement discussions broke down in early August 2021, at which point Bellridge decided to file suit.  (Id. at 12–13).

**B.   Procedural Background**

On August 23, 2021, Bellridge filed the Complaint, and on September 7, 2021, served EVmo with the Summons and Complaint.  (ECF Nos. 1; 8).  After EVmo failed to timely appear, the Clerk of the Court entered a Certificate of Default against EVmo, and Bellridge moved for a default judgment.  (ECF Nos. 8; 11; 20–23).  EVmo appeared and moved to set aside the default.  (ECF Nos. 14; 26–30).  Following an order to show cause hearing, on January 27, 2022, the

Honorable Paul G. Gardephe set aside the default and denied Bellridge's motion for default judgment. (ECF Nos. 24; 35). On February 3, 2022, EVmo filed its Answer. (ECF No. 38). On September 21, 2022, the parties participated in a settlement conference with the Court, but did not reach a settlement. (ECF min. entry Sept. 21, 2022). Pursuant to the operative Case Management Plan, the deadline for all fact discovery is March 10, 2023. (ECF No. 69).

On October 7, 2022, the parties filed a joint status letter in which Bellridge noted its dispute of EVmo's designation of certain documents as protected by the attorney-client privilege. (ECF No. 64). The Court implemented a schedule for the parties to submit letters regarding the privilege dispute, 20 exemplars of the disputed documents, and EVmo's privilege logs. (ECF No. 65). On October 21, 2022, Bellridge submitted its letter explaining why it disputed EVmo's privilege designations, along with EVmo's privilege logs. (ECF Nos. 70; 71; 71-1; 71-2). Although the parties were initially unable to agree on exemplars (ECF No. 72), at the Court's urging, they ultimately submitted a set of 28 exemplars. (ECF No. 75). Because this exceeded the number the Court had permitted, the Court directed the parties to resubmit 20 mutually-agreed exemplars, or ten exemplars from each party. (Id.) Ultimately, the parties submitted a set of 20 exemplars for in camera review (the "Exemplars"). (ECF No. 76). On October 31, 2022, EVmo filed a letter explaining the basis for its privilege designations. (ECF No. 74).

On November 3, 2022, the Court held a conference during which it heard the parties' arguments regarding the privilege designations. (ECF Nos. 65; 78; see ECF min. entry Nov. 3, 2022). EVmo's counsel represented that El-Batrawi negotiated the Warrant with Klimov, and "was tasked by the [C]ompany's management with trying to secure . . . th[e] modification" reflected in the Warrant Amendment. (ECF No. 78 at 22). As a result, EVmo's counsel "needed

5

to speak to [] El-Batrawi to try to understand[] . . . what he said happened[.]" (Id.)  At the Court's direction following the conference, the parties submitted a joint letter that:  (i) listed the titles of the individuals referenced in the Exemplars; (ii) attached an email from Pickard discussing the Warrant Amendment (the "Pickard Email"); and (iii) indicated that Bellridge does not challenge EVmo's attorney work product designations.  (ECF Nos. 80; 84).  On November 29, 2022, the Court held another conference in which the parties offered further argument for and against EVmo's privilege assertions.  (ECF Nos. 82; 85).

### III. DISCUSSION

#### A. Attorney Client Privilege

In the Motion, "Bellridge challenges EVmo's exclusion from its production and [El-]Batrawi's production [] 212 documents reflecting communications the Company and/or its counsel had with El-Batrawi after his resignation" on February 1, 2021.  (ECF No. 70 at 2–3).  Bellridge is not challenging the privilege assertion as to communications El-Batrawi had with EVmo or its counsel[2] before that date, nor is it challenging EVmo's assertion of the work product and common interest protections.  (ECF Nos. 70 at 2; 80 at 4; 85 at 14–15).

##### 1. Legal Standard

The attorney-client privilege protects "confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance."  In re Cnty. of Erie, 473 F.3d 413, 418 (2d Cir. 2007); see N.Y. C.P.L.R. § 4503(a)(1); see also Rossi v. Blue Cross & Blue Shield of Greater N.Y., 73 N.Y.2d 588, 593 (1989).[3]  A party who invokes attorney-client privilege

---

[2] EVmo was represented in 2021 and during this action by Withers Bergman LLP ("Withers").
[3] The Warrant provides for the application of New York law.  (ECF No. 1-1 at 21).

"must demonstrate that the information at issue was a communication between client and counsel or his [or her] employee, that it was intended to be and was in fact kept confidential, and that it was made in order to assist in obtaining or providing legal advice or services to the client." Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 470–71 (S.D.N.Y. 1993); see In re Grand Jury Proc., 219 F.3d 175, 182 (2d Cir. 2000); Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 377 (1991).  To meet this burden, the party asserting the privilege must show that the communications were "(1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." Brennan Ctr. for Just. at N.Y. Univ. Sch. Of L. v. U.S. Dep't of Just., 697 F.3d 184, 207 (2d Cir. 2012); see Charter One Bank, F.S.B. v. Midtown Rochester, L.L.C., 191 Misc. 2d 154, 166 (Sup. Ct. Monroe Cnty. 2002).  "Any ambiguities as to whether the essential elements have been met are construed against the party asserting the privilege." Koumoulis v. Indep. Fin. Mktg. Grp., Inc., 295 F.R.D. 28, 38 (E.D.N.Y. 2013), aff'd, 29 F. Supp. 3d 142 (E.D.N.Y. 2014).

The mere fact that a document was transmitted between an attorney and his or her client does not render the document privileged.  See Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.), 139 F.R.D. 295, 300 (S.D.N.Y. 1991).  Rather, it "must contain confidential communication relating to legal advice." Id.; see Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH), 2001 WL 1356192, at *1 (S.D.N.Y. Nov. 2, 2001) (rejecting argument that "any reference to any communication between [a client] and one of his attorneys on any document shields that entire document from disclosure, whether or not the document reveals communications made by [the client] to his attorneys in confidence and for the purpose of obtaining legal advice").  As this Court has explained, "the privilege attaches not only to

7

communications by the client to the attorney, but also to advice rendered by the attorney to the client, at least to the extent that such advice may reflect confidential information conveyed by the client." In re Keurig Green Mtn. Single-Serve Coffee Antitrust Litig., No. 14 Md. 2542 (VSB) (SLC), 2020 WL 8465433, at *2 (S.D.N.Y. Oct. 30, 2020) (quoting Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 441–42 (S.D.N.Y. 1995)) (internal quotation marks omitted).

"The attorney-client privilege was designed 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and [the] administration of justice.'" TVT Recs. v. Island Def Jam Music Grp., 214 F.R.D. 143, 144 (S.D.N.Y. 2003) (quoting Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)). "Because the privilege 'stands in derogation of the public's right to every [person's] evidence . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" TVT Recs., 214 F.R.D. at 144 (quoting Grand Jury Proc., 219 F.3d at 182); see Brown v. Barnes & Noble, Inc., 474 F. Supp. 3d 637, 648 (S.D.N.Y. 2019) ("The privilege is narrowly construed because it renders relevant information undiscoverable."), aff'd, 2020 WL 5037573 (S.D.N.Y. Aug. 26, 2020).

District courts in the Second Circuit have recognized that "wholesale application of the Upjohn principles to former employees as if they were no different than current employees is not justified by the underlying reasoning of Upjohn." Peralta v. Cendant Corp., 190 F.R.D. 38, 40 (D. Conn. 1999). Instead, courts have explained that:

> communications (1) which occurred during employment remain privileged; (2) of whose "nature and purpose" was for the corporation's counsel to learn facts related to a legal action that the former employee was aware of as a result of his or her employment, are privileged regardless of when they occurred; and (3)

between a corporation's counsel "and a former employee whom counsel does not represent, which bear on or otherwise potentially affect the witness' testimony" are not privileged.

Nicholls v. Philips Semiconductor Mfg., No. 07 Civ. 6789 (KMK) (GAY), 2009 WL 2277869, at *2 (S.D.N.Y. July 27, 2009) (quoting Peralta, 190 F.R.D. at 41–42); Price v. Porter Novelli, Inc., No. 07 Civ. 5869 (PAC), 2008 WL 2388709, at *2 (upholding privilege assertion as to company counsel's communications with former vice president of human resources). In Nicholls, for example, the court held that the attorney-client privilege applied to "any communications, occurring at anytime, between defense counsel and former employees, whose 'nature and purpose' was for defense counsel to learn facts related to this legal action and which the former employee was aware of as a result of his or her employment at [the company][.]" 2009 WL 2277869, at *2.

In addition, "[t]o determine whether a consultant should be considered the functional equivalent of an employee, courts look to whether the consultant had primary responsibility for a key corporate job, . . . whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation, . . . and whether the consultant is likely to possess information possessed by no one else at the company[.]" Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co., 232 F.R.D. 103, 113 (S.D.N.Y. 2005).

To determine whether a former employee acting as a consultant is the "functional equivalent" of an employee, courts consider "'whether the consultant had primary responsibility for a key corporate job' and could make decisions on the corporation's behalf, whether the consultant enjoyed 'a continuous and close working relationship' with 'the company's principals

9

on matters critical to the company's position in litigation,' and whether 'the consultant is likely to possess information possessed by no one else at the company.'" Frank v. Morgans Hotel Grp. Mgmt. LLC, 66 Misc. 3d 770, 774–75 (Sup. Ct. N.Y. Cnty. 2020) (quoting Exp.-Imp. Bank, 232 F.R.D. at 113).  The company bears the burden to show that the consultant "meet[s] this standard of integration into the [company's] corporate structure[.]"  Exp.-Imp. Bank, 232 F.R.D. 113.

### 2. Application

The Exemplars are dated between June 7, 2021 and December 10, 2021, and concern the Warrant Amendment, Bellridge's Exercise Notice, the parties' attempts to resolve the dispute about the Warrant, and this litigation.  Bellridge objects to EVmo's attorney-client privilege assertion as two categories of communications between El-Batrawi and EVmo and/or its counsel: (1) communications after February 2021 concerning the alleged execution of the Warrant Amendment; and (2) communications concerning matters that arose after El-Batrawi's resignation in February 2021, such as the Exercise Notice and this litigation. (ECF No. 70 at 3–5). Although there does not appear to be much of a distinction between these two categories (see ECF No. 78. at 7–9), we will consider them separately.

#### a. Post-February 2021 Communications Regarding the Warrant Amendment

Bellridge first argues that "because El-Batrawi was neither an employee nor an executive of EVmo when the Warrant Amendment allegedly was executed on May 4, 2019[,]" communications with El-Batrawi regarding the Warrant Amendment are not privileged. (ECF No. 70 at 4).  EVmo responds that between June 2016 and February 2021, El-Batrawi "was a managerial agent, as CEO or otherwise, of EVmo[,]" and possessed information regarding the

Warrant and Warrant Amendment "only [] by virtue of his employment/agency relationship with EVmo." (ECF No. 74 at 3).

The Court finds that EVmo has met its burden, at this stage of the action, of showing that, in May 2019 when the Warrant Amendment was entered, El-Batrawi was the functional equivalent of an employee who possessed primary responsibility for the Warrant Amendment and thus had unique information critical to the issues in this action such that the attorney-client privilege protects his communications with Withers. See Exp.-Imp. Bank, 232 F.R.D. at 113. In May 2019, El-Batrawi was not only a consultant to EVmo, but also a director. (ECF Nos. 70-11 at 2; 70-12 at 2; 70-13 at 2 ¶ 3; 70-17 at 2; 70-18 at 2; 74 at 3; 74-1 at 58). EVmo has embraced El-Batrawi as its "authorized, managerial agent . . . in its dealings with Bellridge during this time," i.e., when the Warrant Amendment was executed. (ECF No. 74 at 3; see ECF No. 78 at 23–24 (El-Batrawi "was functionally, with respect to the amended warrant, . . . acting as an agent of the [C]ompany . . . [an] almost envoy . . .")). Withers' communications with El-Batrawi, and other EVmo executives and directors, sought El-Batrawi's knowledge of the Warrant Amendment, the negotiation for which he had primary responsibility, and therefore these "communication[s are] protected from disclosure by [EVmo's] attorney-client privilege under Upjohn." Peralta, 190 F.R.D at 41.

In the alternative, Bellridge invokes the language of the Consulting Agreement that El-Batrawi could not "bind the Company to any agreement" to argue that El-Batrawi's knowledge of Bellridge's Exercise Notice was not "a result of any affiliation he had with the Company[]" and therefore is not privileged. (ECF No. 70 at 4–5). EVmo responds that, at the time the Warrant Amendment was executed, El-Batrawi remained a director of the Company, and points to the

Pickard Email as evidence that the parties' course of dealing modified the Consulting Agreement to authorize him to negotiate the Warrant Amendment. (ECF No. 85 at 8). The Court finds that the language of the Consulting Agreement does not prevent EVmo from asserting the attorney-client privilege over the Exemplars and similar communications between EVmo, Withers, and El-Batrawi. At least at this stage of the action, EVmo has embraced El-Batrawi's actions in negotiating the Warrant Amendment. (Id. at 18–19). As a result, EVmo has met its burden to show that El-Batrawi was sufficiently integrated into the Company's corporate structure at the time to be the functional equivalent of an employee such that Withers' communications with him about the Warrant Amendment, which are critical to the issues in this action, are protected by the attorney-client privilege. See Frank, 66 Misc. 3d at 774–75 (holding that former employee, whom company "immediately retained" as consultant "to perform many of the same duties," was "functional equivalent" of employee whose communications with company counsel were protected by attorney-client privilege).

### b. Communications Regarding Post-Resignation Events

Bellridge argues that Withers' communications with El-Batrawi about "matters [that] arose after his resignation in February 2021[,]" such as Bellridge's Exercise Notice, the Complaint, settlement negotiations, and the Declaration, did not involve information he learned "during his affiliation with the Company" and therefore are not privileged. (ECF No. 70 at 5). EVmo responds that the Exercise Notice and this litigation "almost exclusively concern events that took place when [] El-Batrawi was the CEO of, a consultant to, and/or a director of EVmo[,]" and remain protected by the attorney-client privilege. (ECF No. 74 at 5).

The Court's rationale as to the first category of documents is equally applicable here, and these communications are likewise protected by the attorney-client privilege. In addition, on receiving the Exercise Notice in May 2021, "EVmo was immediately on notice about the potential for litigation with Bellridge." (ECF No. 74 at 2). Accordingly, the work product protection, which Bellridge is not challenging (ECF No. 80), also applies. See Costabile v. Westchester, New York, 254 F.R.D. 160, 164 (S.D.N.Y. 2008) (work product protection applied to document "prepared or obtained because of the prospect of litigation").

## IV. **CONCLUSION**

For the reasons set forth above, the Motion is DENIED and the Court upholds EVmo's assertion of the attorney-client privilege.

Dated:     New York, New York
           December 6, 2022

SO ORDERED.

*[signature]*
SARAH L. CAVE
United States Magistrate Judge